GULF, M. & N. R. Co. *v.* WOOD.

(Division B.  Feb. 27, 1933.)

[146 So. 298.  No. 30469.]

**E. B. Cooper,** of Laurel, and **B. N. Knox,** of New Albany, for appellant.

Geo. **T.** and **Chas. S. Mitchell,** of Tupelo, for appellee.

Argued orally by **Ellis B. Cooper** and **B. N. Knox**, for appellant, and by **Geo. T.** and **Chas. S. Mitchell**, for appellee.

**Griffith, J.**, delivered the opinion of the court.

Appellee's decedent was the engineer in charge, as such employee, of an interstate southbound freight train of appellant on August 15, 1927. This freight train reached the station called Westport, in the state of Tennessee, at about 4:59 or five o'clock P. M. A northbound passenger train was due at this station at 5:07, and to depart therefrom at 5:08. The passenger train was, of course, superior in right to the freight train, and it was the duty of the engineer of the freight train, under the rules, to take the siding at the nearest or north entrance thereto as he arrived at the passing track of said station. The passing track of some two thousand feet in length was clear, and there was no sound reason why the freight engineer did not enter it from the north end, as his duty required of him. When he neared the north end of the passing track, he slowed down, and all the other members of the train crew supposed that he intended to take the course mentioned. However, just before he reached the said passing track, he increased speed, whereupon both the head brakeman and the fireman called his attention to the fact that he would have to take the siding at this station to clear the track for the passenger train then soon due. No answer was made by the engineer. The conductor and the flagman riding in the caboose noticed this failure to head in at the north or nearest entrance to the side track, and noticed the increased speed, whereupon both the latter employees looked out for the station signals to see if any signal

was there displayed indicating that the freight train should proceed without clearing there for the passenger train. The station agent also saw the rate of speed, and as the train passed the depot he gave the engineer a signal by hand that he must not pass, but would have to clear the track at that point for the other train. Seeing all this, the conductor immediately applied the emergency brakes by a device in the caboose supplied for that purpose. The engineer succeeded nevertheless in "dragging the train," as some of the witnesses term it, to a point south of the south entrance to the passing track, and thereupon attempted to back his train into the siding, and in this manner to clear the track.

According to the weight of the testimony, it was about one minute past five o'clock when the freight train was brought to a stop at the south end of the passing track; and according to the schedule of the passenger train, that train would be due to arrive at this particular point about 5:06 or 5:07. It did actually arrive there at 5:07. Thus the engineer had a space of from five to six minutes, in which to back his train, which was a light train of only sixteen cars, into the siding and clear the main line. And according to all or practically all the testimony it would not require over two or three minutes to back in a train of this length and clear the track, if the machinery were in good and safe condition. Under the rules, when this freight train had stopped on the main line south of the depot and with another train due from the opposite direction so soon, it was the duty of the head brakeman to proceed at once and with all speed towards the south, the direction from which the passenger train was coming, and to flag the passenger train, and particularly was this true in this case because the track south of where this freight train had stopped was not straight, but was in a curve so that the employees on the engine of the passenger train could not become aware that the track ahead was blocked except in re-

sponse to a flag. The head brakeman, in obedience to this rule, immediately started down the track to flag as was his duty, but he was called back by the engineer; it being the further rule that the head brakeman in such a case is under the orders of the engineer. The evidence is sufficiently, if not conclusively, to the effect that if the head brakeman had not been called back by the engineer he would have had time to have proceeded far enough down the track to have given warning in time to have stopped the passenger train before it arrived at the point of collision.

When the switch was thrown, and which was immediately done, for the backing of the freight train into the siding and the signal was given to the engineer to back, it was found that the train could not be moved because the brakes were stuck. The engineer made diligent efforts by the driving of his engine backward and forward against and from the cars to unloose the brakes: the usual response not having obtained by the use of the brake valve on the locomotive which, when in proper working condition, will release the brakes in less than one minute's time. Not being able to release them from the engine, the train crew, and particularly the conductor, swiftly moved from car to car releasing the brakes by hand or by "bleeding" them as it is termed in railroad parlance; with all these efforts only three cars had been pushed into the side track when the passenger train came upon the scene running at a high rate of speed, and the result was a collision, great property damage, personal injury to numbers of people, and the death of the freight engineer.

There is evidence sufficient to go to the jury that the brakes on this freight train were defective and that this was known to the engineer before he reached Westport. This is all the more reason why he should have headed in at the north end of the passing track, and why he later should have sent forward the head brakeman to flag, in-

stead of calling him back. The evidence is still stronger that the brakes and the braking mechanism were defective when and at the time the engineer attempted to back into the siding, and which, according to the great preponderance of the testimony, he had time to do and to safely clear the track if the braking apparatus had been in that condition of safety required by the several federal safety appliances statutes. The engineer was guilty of contributory negligence in two respects, and without his said negligence the injury would never have occurred. But in spite of his contributory negligence in both respects, the evidence is sufficient to show that if the brakes had been in good order and capable of that safe operation required by law in regard to the appliances on interstate railroads, he would have been able to avert any injury and thus to avoid the effects of his contributory negligence. Therefore, the express terms of the proviso of section 53, title 45, United States Code Annotated, applies; that proviso reading as follows: ''Provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.'' The law in such cases has been settled in numerous cases by the federal courts, and nothing of value can be here added by a review of the decided cases. See for instance, Union Pac. R. Co. v. Huxoll, 245 U. S. 535, 38 S. Ct. 187, 62 L. Ed. 455, and our own case, Alabama & V. R. Co. v. Dennis, 128 Miss. 298, 91 So. 4, as recognizing the absolute and unqualified duty of the interstate carrier to maintain the safety appliances covered by the federal statutes, and when the facts show such a failure, as a contributing cause to the injury, then the futility of the defense of negligence on the part of the employee.

There was a verdict for plaintiff for five thousand dollars. Deeming this amount grossly inadequate, appel-

lee made a motion for a new trial and has prosecuted a cross-appeal, and urges that the verdict should have been not less than twenty-five thousand dollars, based upon the decedent's life expectancy according to the average mortality tables and the monthly amount which the decedent out of his salary as engineer contributed to his statutory beneficiaries. There are several reasons why, as we think, the jury was warranted in withholding any larger amount than was allowed here. One of these reasons is that while contributory negligence is not a defense in an interstate case involving defective appliances, and the amount of the recovery is not to be diminished on account thereof, this rule does not prevent the jury from applying practical common sense to the solution of the question of probable life expectancy, and the jury in this case may have come to the conclusion that there would not probably be any life expectancy for a substantial period of an employee such as the engineer in this case whose disposition to deliberately and stubbornly take dangerous chances is so clearly demonstrated, as was done under the evidence in this case. But if it may be used that the jury did not take any such view and would not have been warranted in so doing, there is the still more pertinent consideration, that the jury may have concluded that, had this engineer survived, he would have received the same just judgment at the hands of the employer company as was accorded to the head brakeman, to-wit, an immediate discharge, with no substantial prospects of obtaining like employment elsewhere, thus leaving his future earning capacity problematical and conjectural.

Appellant railroad company has raised a point in this case that has given us far more trouble than any of the matters above mentioned; and that point is, that although the suit was brought by and in the name of the administratrix, and although it is admitted that the administratrix was duly and legally appointed by the proper court

of Madison county, Tennessee, yet it was objected by appellant and admitted by the administratrix that she had taken out no ancillary letters of administration in this state, nor had she filed the certified copy of her foreign appointment as required by section 1723, Code 1930. Appellant railroad company relies on the well-recognized and generally accepted rule that the appointment of an administrator or executor has no extraterritorial effect, and that as a general rule an administrator can sue in another state only upon the terms allowed by statute in the latter state, and that the foreign administrator must bring himself within those statutes. Appellee takes the position that the Federal Employers' Liability Act, in appointing the personal representative as the person to bring the suit, and as the only person who can do so, created the personal representative as a statutory agent or trustee, not of the estate of the decedent, but of those entitled to participation in the proceeds of the recovery, and that therefore the rules applicable to the ordinary administrator or executor in probates do not control under this federal statute.

Many authorities are cited on both sides, but we have come to the conclusion that the logic of the federal decisions supports the view contended for by appellee. The federal statute controls in every substantive particular, and this includes, of course, the party in whom the cause of action is vested, and who alone is authorized to sue. If the federal statute had allowed the beneficiaries to sue in their own name, this would be controlling upon state courts, although the beneficiaries were nonresidents, and likewise had the statute authorized the suit by and in the name of a trustee or agent, or a next friend. It was the purpose of the federal statute in restricting these suits to the personal representative to provide that a responsible person, officially designated as such by the local authorities, who are to be presumed to be well informed concerning the decedent's statutory

beneficiaries, should be recognized as the plaintiff, and that thereby collateral issues shall be eliminated from the trial in respect to who are actually the beneficiaries, and it may be that there was also the purpose that the appointed personal representative could be held on his official bond in case he failed to account to the entitled parties after payment to the representative of the amount of the recovery, although in Maryland Cas. Co. v. Mc-Alpin, 31 Ga. App. 303, 120 S. E. 644, it was held that the administrator is not liable on his bond in such case; the court holding that the recovery is no part of the decedent's estate.

We decide the question by an application of the language used in Lindgren v. United States, 281 U. S. 38, 41, 50 S. Ct. 207, 209, 74 L. Ed. 686, 690, where, in discussing the operation and effect of the Federal Employer's Liability Act (45 U. S. C. A., sec. 51), it was said: "By this section if the injury to the employee results in death, his personal representative—while not given any right of action in behalf of the estate—is invested, solely as trustee for the designated survivors, with the right to recover for their benefit such damages as will compensate them for any pecuniary loss which they sustained by the death." We are of the opinion that when the plaintiff has shown, as was shown in the case, that he has been actually and legally designated as the statutory trustee by a lawful appointment as the personal representative in the state, and in and by the court of that state, having competent jurisdiction to make the appointment, then the person so appointed may sue in this state under the Federal Employers' Liability Act, and that ancillary letters or a compliance with section 1723, Code 1930, is not necessary in such a case.

Affirmed on direct and on cross appeal.